\* STEWART *v*. EMERSON.

In assumpsit for the price of goods sold, when the defendant pleads discharge in bankruptcy, the plaintiff is not estopped by the form of his action to reply that the debt was created by the fraud of the defendant· A debt is created by fraud, when one, intending not to pay for goods, induces their owner to sell them to him on credit, by fraudulently representing or causing the owner to believe he intends to pay for them, or by fraudulently concealing the intent not to pay.

ASSUMPSIT, by William Stewart against Dudley B. Emerson, upon the common counts.

Writ dated October 10, 1866. At the January term, 1869, the defendant pleaded a discharge in bankruptcy, obtained since the last continuance. At the January term, 1871, the plaintiff filed the following specification :

" This action is brought to recover the amount of the following account : Dudley B. Emerson to William Stewart, Dr., July 23, 1866, to ¾ pipe Dragon gin, $463.25 ; cartage, 75 cts. ;—September 8, to 2 bbls. Miller's whiskey, $231 ; cartage, 75 cents ;—total, $694.75."

At the same term the plaintiff replied, " that the debt sought to be recovered in this suit was created by the fraud of the said defendant." Rejoinder traversing the replication. Issue thereon.

The plaintiff's counsel, in opening, stated in substance that they proposed to prove the proposition hereinafter specified in the instructions to the jury. The defendant, therefore, objected that the suit was in affirmance of the contract, and that the facts proposed to be proved by the plaintiff did not bring the case within the provisions of the bankrupt act; but the objection was *pro forma* overruled, subject to exceptions, and the trial proceeded.

It appeared that the defendant gave the plaintiff a verbal order for the gin about July 13, 1866, at Manchester, and that the plaintiff forwarded the gin from New York about ten days after. The only testimony, as to the conversation at the time of the order, came from the plaintiff and the defendant. The plaintiff testified on this point substantially as follows : " At the time of ordering the gin, the defendant was already owing me about $500, a debt contracted by the firm of Hill & Emerson. The defendant, at the time of ordering the gin, told me that he had purchased a house which cost $1,200, and had paid cash for it, and it was his house ; that he was doing a fair, good business ; that he could n't pay any then, because he had purchased a house, but would remit soon a part of the debt. I think he told me that he was not owing much ; that his liabilities were very light. At the time of this gin trade I called on Emerson for a payment on account of his indebtedness, and he gave the house purchase as a reason for inability to pay then."

\* This case was decided June term, 1872.          REPORTER.

The defendant denied everything material in the foregoing testimony, and testified that at the time of purchasing the liquors he intended to pay for them.

It appeared that the defendant had not bought a house, nor paid $1,200 towards the purchase of a house. It also appeared that the defendant, at the time of purchasing the gin, had no property except what was under mortgage,—the principal, if not the only mortgage, being a mortgage to his brother-in-law, Joseph G. Hill, executed June 27, 1866. There was evidence tending to show that this mortgage was fraudulent as against the defendant's creditors. The whiskey was ordered by letter shortly before it was sent, September 8, 1866. September 20, 1866, the defendant executed a bill of sale to said Hill of all the property in his saloon. There was evidence tending to show that the gin, and a portion of the whiskey, were included in this sale to Hill, and subsequently attached on this writ,—a suit being afterwards commenced by said Hill against the officer who made the attachment. There was also evidence tending to show that this sale to Hill was in fraud of the defendant's creditors.

The jury were *pro forma* instructed, in substance, that they should return a verdict " that the debt was created by the fraud of the defendant," if they found,—1. That the defendant, by his acts or words, prior to or at the time of the sales, intentionally induced the plaintiff to believe that the defendant intended to pay for the liquors. 2. That the defendant in fact did not intend to pay. 3. That the defendant induced this belief, intending to deceive the plaintiff, and to induce him to sell the liquors to the defendant. 4. That the plaintiff was thereby deceived. 5. That the plaintiff was induced by this misrepresentation to make the sales, and would not have made the sales if the defendant had not made this misrepresentation. Or if they found,—1. That the defendant, prior to or at the time of the sales, made representations to the plaintiff respecting the amount of his property or his means of payment, and that such representations were not true in fact. 2. That the defendant, when he made such representations, knew them to be untrue. 3. That the defendant made such representations intending to deceive the plaintiff, and to induce him to sell to the defendant, although the defendant might at the same time have intended to ultimately pay for the liquors. 4. That the plaintiff was thereby deceived. 5. That the plaintiff was induced by these representations to make the sales, and would not have made them if the defendant had not made these representations.

The jury found that " the debt was created by the fraud of the defendant," and assessed the plaintiff's damages at the full amount of his specification, with interest.

After verdict, the defendant seasonably filed the following exceptions and motions: " The defendant excepts to the ruling and charge of the court, that, under the specification and pleadings in this action, the plaintiff would be entitled to a verdict, if the sale of the liquors was induced by fraudulent misrepresentations as to the defendant's property,

the sale having never been rescinded, and the suit being upon the contract and not in disaffirmance of it. The defendant also excepts to the charge that the plaintiff was entitled to a verdict, if the defendant, without intending to pay for the liquors, by his words or acts, induced the plaintiff to believe that he did intend to pay for them, and to sell him the goods in consequence. The defendant also moves in arrest of judgment, and for a repleader, for the reason that the replication does not allege sufficient to avoid the plea under the specification in this suit." The case was reserved.

PRINTED ARGUMENTS.

*C. R. Morrison*, for the defendant.

I. With all the knowledge of any fraud that he now has, the plaintiff, in October, 1866, brought his suit upon the contract to recover the stipulated price (which we apprehend was considerably more than the real value of the liquors), attached the same liquors, or the greater part of them, as the property of Emerson, and prosecuted his suit upon this basis, without setting up any pretended fraud as any ground of claim until after the defendant's discharge in bankruptcy. He is bound by his election. He is estopped to say that the debt was one " created by the fraud or embezzlement of the bankrupt."

II. This case differs widely from the cases originating in the State of New York under their code, in which,—the defendant having at the commencement of the suit been arrested upon affidavit charging fraud as the ground of claim,—the court in bankruptcy have refused to discharge from the arrest; for those suits were commenced and prosecuted for the defendant's fraud, and this fact appeared upon the affidavit and order of arrest at the outset.

*In re* Robinson 2 B. R. 108, and 6 Blatch. 563, NELSON, J., in sustaining the ruling of the district judge, says,—" It was urged in behalf of the bankrupt that it should appear from the record itself,—that is, from the declaration in the case,—that the suit in the court of common pleas proceeded in that court on the ground of fraud. But the question is one of practice rather than of principle." " The mode of proceeding in the court of common pleas, in ·a case where the debt is claimed to have been created by the fraud and deceit of the debtor, may be peculiar, and may differ from the practice in the courts of other States ; but it is understood to be warranted by the New York law, and if so, the record is entitled to as much verity as if the proceeding were more formal and specific." This is a distinct recognition of the principle for which we contend, viz., that the suit must have proceeded from its commencement *on the ground of fraud*. Such is also the effect of the ruling of C. J. BRIGHAM, in *Morse* v. *Hutchins*, 102 Mass. 439 ;—see, also, *in re* Whitehouse, 4 B. R. 15.

By the law and practice of this State, the present suit is not to be regarded as having proceeded on the ground of fraud, but the reverse.

The action is for goods sold and delivered. The specification imports this. *Newmarket Iron Foundry* v. *Harvey*, 23 N. H. 395. We require a party who would rescind, to do it promptly and unequivocally upon discovery of the fraud, and make a demand for the money before suit, if he claims the *proceeds* in disaffirmance, instead of the *price* in affirmance of the contract. *Swanzey* v. *Company*, 48 N. H. 200; *Judge of Probate* v. *Stone*, 44 N. H. 593; *Weeks* v. *Robie*, 42 N. H. 316; *Cook* v. *Gilman*, 34 N. H. 556; *Jacobs* v. *Shorey*, 48 N. H. 100; *Kingsbury* v. *Smith*, 13 N. H. 109.

III. The first branch of the instructions raises the question whether the purchase of goods, with a preconceived purpose of not paying for them, is of itself a fraud in a legal sense such as the courts will take cognizance of. Whatever conflict of authority there may be elsewhere, we contend that, by the common law and by the law of this State, such conduct, although morally dishonest, is not a legal fraud, and the maxim *caveat emptor* prevails. *Nichols* v. *Pinner*, 18 N. Y. 303; *Smith* v. *Smith*, 21 Pa. St. 367; *Powell* v. *Bradley*, 9 G. & J. 221; *Cross* v. *Peters*, 1 Greenl. 376; *Bell* v. *Ellis*, 33 Cal. 620; *Salem Co.* v. *Adams*, 23 Pick. 256; *Page* v. *Parker*, 40 N. H. 47, 71; *Hoitt* v. *Holcomb*, 32 N. H. 185, 203; *Medbury* v. *Watson*, 6 Met. 246, 259; *Vernon* v. *Keys*, 12 East 632; *Gallagher* v. *Brunel*, 6 Cow. 346; 2 Kent's Com. 484, 514; *Starr* v. *Bennett*, 5 Hill 363; *Bagley* v. *Morrel*, Cro. Jac. 386; *Deming* v. *Foster*, 42 N. H. 165.

Any one who buys goods, "by his acts or words" "intentionally induces" the seller "to believe that he intends to pay for them; otherwise he would not obtain the goods." An application for credit (which is an *act*) is a representation that he *intends* to pay, and *will* pay, and frequently there is in addition an express promise. Yet, upon the charge, in all cases, there is an actionable fraud, if the seller can induce the jury to believe—and upon a plea of bankruptcy most juries will be quite willing to believe—that the purchaser did not intend to pay. No one should be heard to say that he was *deceived* by such an application, there being no artifice or misrepresentation beyond this. Courts will have their hands full if they take cognizance of such matters as a legal fraud. Moreover, none of the decisions go beyond holding that the seller may under such circumstances *rescind* and reclaim, as he may while goods are *in transitu* in case of intervening insolvency. 1 Parsons on Con. 178. They do not hold that he can otherwise be proceeded against as for a fraud.

*Morrison & Stanley*, for the plaintiff.

The defendant, instead of availing himself of any other defence which he might have made, saw fit to join issue on the question "whether the debt sought to be recovered in this suit was created by the fraud of the said defendant," and has thereby waived all other defences, save such as may arise upon the question at issue, and shall not now be heard to say that the question of fraud should have been

raised by some other and different form of action. But what does the first objection avail, relying as the defendant does upon the New York decisions? For those actions, under the forms of their code, were brought upon the debt, and held that arrests made upon such suits in the State courts would not be interfered with; that it was sufficient if it appeared from the records of the State courts that fraud was made the ground of the arrest. *In re* Rosenburg, 2 Bank. Reg. 81; *in re* Solomon Migel, 2 Bank. Reg. 153; *in re* Kimball, 2 Bank. Reg. 74.

BLATCHFORD, J., says,—"Under this provision (26 section of the Bankrupt Act relating to arrests) it has been held by this court that if the arrest is founded on a claim from which a discharge in bankruptcy would not release the bankrupt, he is liable to arrest, whether the action is founded on such claim or not,—it frequently happening in the practice of the courts of the State of New York that the complaint discloses a simple contract debt, while the affidavits on which the arrest is founded show that the debt was contracted by fraud, and is one which would not be discharged by a discharge in bankruptcy." *In re* John H. Kimball, before cited. "The judgment against the petitioner, under which he anticipates arrest, appears to have been rendered upon a debt created by the fraud of the bankrupt." Motion for discharge denied. Julius R. Pettis, 2 Bank. Reg. 17.

"It was argued, on behalf of the petitioner, that it should appear from the record itself,—that is, from the declaration in the case,—that the suit in the common pleas proceeded in that court on the ground of fraud." *Held*, that the proceedings and judgment in the common pleas carried on the face of them that the suit was one to recover a debt created by the fraud of the debtor; that it would not go behind that record to call in question its verity in the bankrupt court; that it was a question of practice rather than of principle; that the practice of the courts of different States differs; but that, according to the New York practice, the record is entitled to as much verity as if the proceedings were more formal and specific. *In re* Ward E. Robinson, 2 Bank. Reg. 108. The bearing, then, of the New York practice seems to be, that the suit may be brought upon the *debt;* that a party arrested upon such suit; the affidavit showing fraud, will not be discharged; that the declaration may show only a contract debt;—and if from the whole proceedings of the court the ground of fraud is made to appear, the debt will not be discharged by the discharge in bankruptcy, nor the party when arrested from arrest, nor a judgment obtained upon such debt, decree satisfied. When the discharge is pleaded, the question of the extent of its operation upon the debts of the bankrupt, and whether a particular debt is or is not discharged by it, comes up for determination by the court in which the suit is pending, in which it is pleaded. *In re* Myron Rosenburg, before cited. So far, then, as it is objected that it did not appear from the declaration in this suit that said debt was created by fraud, it amounts to nothing, according to the New York practice; and, if fault it were, by the practice of other States, it has

all been remedied by the pleadings which became a part of the record, and by the verdict,—and the court has full power to determine its force and effect.

That the plaintiff elected to bring his suit in affirmance of the contract, is true, as claimed; and had the defendant never become bankrupt, the question never would have arisen as to whether the debt was contracted by fraud. What, then, is it claimed that the plaintiff is estopped to say? Just what the bankrupt act expressly says he may say; just what it intended he should answer in reply to the plea of discharge. *Wiggins* v. *Shapleigh*, 20 N. H. 447, was *assumpsit.* Answer, discharge in bankruptcy, to which was a demurrer. *Held*, "If the debt sought to be avoided or barred by the discharge is of the fiduciary or other excepted class, it may be so stated in the replication, and the plea will thereby be answered and avoided." The same was held in *Johnson* v. *Ball*, 15 N. H. 408, which was also assumpsit: plea, discharge in bankruptcy.

Aside, for the moment, from the question of discharge or no discharge,—Was there a debt existing between these parties, recoverable in assumpsit? If there was not, then of course none so existed that the discharge is now no bar. Contracts, obtained through fraudulent representations, are voidable at the election of the party thus defrauded. *Bank* v. *Gregg*, 14 N. H. 331; 40 N. H. 50. A party shall not be permitted to prove his own fraud, as a ground on which to rest his own action or his defence. 23 N. H. 128; Story on Con. 167. The general doctrine is, that fraud vitiates all contracts affected by it, but fraud does not render such contracts void absolutely. It renders them voidable— liable to be set aside by the party injured, if he so elect. 28 N. H. 330. This principle is further shown by the distinction between conditional sale and sale by fraud. In the latter case, the property passes by the sale and delivery, liable to revest at the option of the vendor, before the interest of innocent third parties intervenes; and we submit that there was a debt created between these parties, recoverable in this form of action.

How was said debt created?

The defendant has asked this question, and from the jury received his answer,—"by the fraud of the defendant,"—if the instructions of the court were correct. How are such debts affected by the bankrupt's discharge? The act is express: No debt created by the fraud or embezzlement of the bankrupt, &c., shall be discharged under this act. What is a debt created by fraud? Just what is presented in the case at bar, if we comprehend the language of the courts, and the purposes and objects of the bankrupt act. Says His Honor S. L. Withey, speaking of the 33d section of said act,—"Wisely was this provision made, and equally wise to exclude it from the grounds of opposition to a bankrupt's discharge. As to a debt created by fraud, there is and should be no discharge." 2 Bank. Reg. 14. Speaking of such debts, Field, J., says,—"He [the creditor], like other creditors, is entitled to receive a dividend; but this dividend, instead of being a payment in full, is only a payment on account, and the bankrupt is forever liable for the

balance of the debt." In all the cases before cited from the Bank. Reg., it is holden that debts created by fraud are no ground for opposing a discharge; and in nearly all, the court adds that such debts are not discharged by a discharge in bankruptcy. And one can but reason that they are no ground of opposition, *because* they are not discharged. Such is the language of the district judges throughout their decisions.

When, then, they talk about *debts* not discharged, debts to be proved but dividend, only a payment on account, do they mean that, or do they use the word debt when they mean a claim or demand arising from a tort? When they talk of a dividend being payment on account of debts created by fraud, and the bankrupt forever liable for the remainder, do they say that and mean something else,—perchance an unliquidated damage arising from some malfeasance or nonfeasance, and that, too, only an amount made certain by one form of action?—at the same time saying that the practice of different States differs, and that it is enough that the record shows that the fraud of the bankrupt was the moving cause? They do not stultify themselves by this indiscriminate use of terms; and your honors need no authorities cited to show that the words debts, claims, and demands are not synonymous terms. The bankrupt acts, though somewhat hurriedly drawn and passed, keep a distinction carefully in view. In one section or clause we find,—" all *debts* due and payable;" in another,—" all *demands;* " and again,— " unliquidated *damages,*" and all " *debts* created by fraud," &c. There was a twofold purpose in making this exception clause more broad and general than those in the English bankrupt acts, or in ours of '41, or in any of the State insolvent laws;—1. That the seller might with more safety to himself trust to the purchaser's statement. 2. That it might act as a penalty to deter from committing such acts, and as a punishment upon him who should thus do ;—for what could more effectually check him, who, by fraud, deceit, or covin, would obtain the goods of another, than the thought and knowledge that, if unfortunate, a discharge would be no release from such debts, but that he would be continually harassed and annoyed, and that death alone could release him from them? The beneficial effect of this is seen in the small number of such debtors; and because this defendant has voluntarily incurred this punishment, its force will not be lessened, nor its effect be the less salutary, that he receives the punishment he merits, and is ordered to pay as the act directs.

The justice of this exception, the purpose with which it was made, and its intended effect, help us to construe its language. Or is this exception,—this penalty, as we construe it,—like an empty bubble, as the defendant would make it? Does it burst and vanish into thin air, unless enforced by a single form of action ? Shall substance give way to shadow ? Shall courts lose sight of the intended purposes, consequences, and effects of certain acts, by that which at best is admitted to be a peculiarity of the practice of State courts, differing in each ? There is no such practice even established in Massachusetts, as the defendant would intimate. 102 Mass. 439 was a suit for tort, with a count in assumpsit

annexed, according to the forms of their practice, but which obliges the claimant to rely on either the one or the other. The ruling of Judge BRIGHAM was, in fact, saying,—Your suit is brought on the tort (not like those in New York on the debt) : you can proceed only on one ground by statute—go ahead on the fraud. The question here presented was not even argued, much less passed upon, by the full bench. The instructions to the jury were in two chains or branches. The finding of either gave a verdict to the plaintiff. Each set was to be considered as a whole. Now the first branch does not raise the question, as claimed by the third section of the defendant's brief; for that would only arise from the first link of the first chain, taken by itself. The real question that is raised there is, Is it not a fraud for the defendant,—not intending to pay, but to deceive the plaintiff and induce him to sell,—by his acts and words to so deceive the plaintiff, and by his misrepresentations induce the plaintiff to make a sale which he would not have made but for such representations? *Palfrey v. Freeman,* Smith's Leading Cases, vol. 2, p. 167. A sale is not avoided by the mere insolvency of the buyer, or his knowledge of insolvency or inability to pay, unless accompanied by an *intention* not to pay. The question of intent is for the jury. Hilliard on Sales, sec. 6, p. 331, and cases cited. Where the purchaser is insolvent, and has no reasonable expectation or intention of paying for the goods, or where he fraudulently *misrepresents his ability to pay,* he gains no title against the vendor. Hilliard on Sales, sec. 7, p. 332. The defendant's assertions, his mere words, would not necessarily subject him to an action, but the essential requisite that they were " misrepresentations," that they were false, was found by the jury, and made part of the instructions. The same principle is shown in the liability of third parties : as, if one, by wickedly asserting what he knows to be false, draws another into loss, he is liable to an action for damages. " To prove fraud in a sale on the ground that the vendee did not intend to pay for the property, it is not absolutely necessary to show a false pretence, or other direct artifice, in regard to the individual purchase." Hilliard on Sales, sec. 8, p. 334. The decisions in this State go quite as far as the instructions given in this case. " The misstatement of facts must be a statement of what is false and known to be such, or not known to be true to the fraudulent party, in a point, &c., which he did in fact rely upon, and by which he was misled to his injury." *Hoitt* v. *Holcomb,* 23 N. H. 552, and repeated as law in 29 N. H. 343 ;—see, also, *Jones* v. *Emery,* 40 N. H. 350, and cases cited.

Fraud consists in intention. *Moss* v. *Riddle & Co.,* 2 Curtis (U. S. S.) 290. " By fraud, I understand an intention to deceive : whether it be from any expectation of advantage to the party himself, or from ill-will towards the other, is immaterial." LE BLANC, J., *Haycraft* v. *Creasy,* 2 East 107. " It is fraud in law if a party makes representations which he knows to be false, although the motive from which the representations proceed may not have been bad." *Foster* v. *Charles,* 7 Bing. 107.

We understand the making a representation which a party knows to be untrue, and which is calculated, from the mode in which it is made, to induce another to act on the faith of it, so that he may incur damage, is a fraud in law ; that it is the same whether taken advantage of by the rules of law or of equity, though relief is often given by the latter where it is impossible by the former.    Labeo defines fraud to be any cunning, deception, or artifice used to circumvent, cheat, or deceive another.    And if sec. 191 of Story's Equity Jurisprudence, to which we refer, is sound, then does it fully substantiate the ruling of the court in both branches, and is a complete answer to any objections to the same.

The defendant's counsel has not, we submit, argued the exceptions taken to the ruling of the court.    Because the buyer or seller, as the case may be, may remain silent and inactive, and get the best of a bargain, and yet not be answerable for latent defects or his own bankrupt condition ; though he may ask for credit, and obtain it, if he can, without falsehood and actual misrepresentations, yet the defendant's counsel, with the high " moral " tone which he shows himself possessed of, does not and cannot come before this court and argue that such misstatements as were made by this defendant to this plaintiff, with the purpose there manifest and the effect they were intended to and did produce, were not a most gross, active, and malicious fraud ; and if such " words and acts," with their intent and effect, were not a fraud, then indeed were these instructions erroneous, and also the language of courts for centuries,—for they are elementary principles, carrying fraud on the face of them, and one inevitable conclusion to every other legal mind.

The defendant, then, we submit, has not shown, neither can he show, anything why this action cannot be sustained as brought, and as the records now stand ; why this is not a debt created by the fraud of the bankrupt ; why this is not a debt such as is meant by the bankrupt act, and is not discharged ; nor why the instructions of the court do not include all the essential ingredients of fraud, and no more ; in short, why we are not entitled to judgment on the verdict.

ORAL ARGUMENTS.

*C. R. Morrison*, for the defendant.

I. This suit is in affirmance of the contract, and the plaintiff is estopped to disaffirm the contract.    Estoppel need not be pleaded.    If this ground could have been taken on demurrer, it can be taken on the motion in arrest of judgment.    Whatever form the action takes, it must be founded on the alleged fraud on which the plaintiff relies. The gist of the action must be fraud.    The plaintiff has elected an action resting on the contract and not on fraud.    It is not necessary that the declaration should in terms show that fraud is the cause of the action ; but it must appear that the action proceeds on the ground of fraud to enable the vendor to take that ground.

II. A debt created by fraud, in the sense of the bankrupt act, would seem not to be merely a debt fraudulently contracted.  It must be caused to exist by the fraud.  The authorities are about equally divided on the question whether a mere intent not to pay is such a fraud as to allow the vendor to rescind the contract.  There should be some act or representation to make a fraud.  To invalidate sales by a mere intent not to pay, would tend to relax the vigilance of vendors and encourage negligence.  If the defendant would not be liable to an action for deceit, the instructions given to the jury were erroneous.

*Stanley*, for the plaintiff.

The object of the statute is to relieve honest debtors.  If the debt would not have been created without the fraud, it was, in a legal sense, created by the fraud.  *Chadbourne* v. *Newcastle*, 48 N. H. 196 ; *Palmer* v. *Concord*, 48 N. H. 211.

DOE, J.  I. The defendant claims that the plaintiff, by this suit upon the contract of sale, affirming the sale, cannot, in this suit, assert the creation of the debt by the fraud of the defendant ; that the fraud of the vendee can be set up by the vendor only in an action founded on the fraud.  The defendant's position is, in effect, that when the declaration is on a contract of sale, and the plea is discharge in bankruptcy, the replication of debt created by the defendant's fraud is bad ; that an issue upon a traverse of such a replication is an immaterial issue, and a trial of such an issue a mistrial ; and that, on a verdict for the plaintiff on such an issue, a repleader should be awarded, or judgment be arrested, or judgment be rendered for the defendant *non obstante veredicto*.  Tidd Pr. 828.  Is such a replication good ? When, in an action brought by a vendor on a contract of sale to recover the price of the goods sold, the defendant pleads a discharge in bankruptcy, can the plaintiff reply that the debt was created by the fraud of the defendant ?

The plaintiff declares upon a promise of the defendant to pay for goods sold, and, if he maintains his action, he maintains it upon the contract of sale affirmed by him.  When a party has an election between two inconsistent rights or remedies,—for instance, when he can rely upon a contract, or renounce the contract and rely upon fraud,— and he has knowledge of all the facts material to be known in making a choice, his selection of one may be a renunciation of another.  *Butler* v. *Hildreth*, 5 Met. 49.  But the plaintiff in this case avers the fraud of the defendant, not as the plaintiff's cause of action, but as a refutation of the defendant's alleged defence of discharge.  The plaintiff claims to recover damages, not for the defendant's fraud, but for the breach of his promise to pay for the goods bought ; and in the replication he alleges the fraud, not as the ground on which his action rests, but to show that there is no ground on which the defendant's discharge can be applied to this debt.  He asserts, not that the sale

was void for fraud, but that, by reason of fraud, the debt was not discharged under the bankrupt act. He asserts the fraud, not for the purpose of rescinding the contract, but to show that the defendant has not been relieved from his obligation to perform his part of the contract.

The replication, " that the debt sought to be recovered in this suit was created by the fraud of the said defendant," follows the bankrupt act in recognizing the distinction between a debt annulled by the creditor's disaffirmance of it at common law, and a debt affirmed by the creditor, and not discharged under the statute by reason of fraud. The bankrupt act provides that no debt created by the fraud of the bankrupt shall be discharged under that act; but the debt may be proved, and the dividend thereon shall be a payment on account of said debt. The statute recognizes a debt, created by the fraud of the bankrupt, as a debt not discharged and not affected by the proceedings in bankruptcy, except so far as it may be paid by a dividend. So far as this case is concerned, the debt, if created by the fraud of the defendant, is excepted out of the operation of the bankrupt act. And when the plaintiff answers the plea ·of discharge by the replication of debt created by fraud, he does not attempt to rescind or invalidate or renounce the contract, but he affirms it, and claims that the debt is a valid, subsisting debt. In the declaration, he asserts a debt. In the replication, he asserts the same debt. He avers the fraud, not to avoid the contract himself, but to show that the defendant cannot avoid it; not to show that, by reason of the fraud, the debt declared upon was never created, but to show that, being created by fraud, it was not discharged under the bankrupt act; not to show that there is no such debt, but to show that there is such a debt notwithstanding the discharge. In this course there is no inconsistency, and the plaintiff is not estopped ·to answer the plea of discharge by the replication of debt created by fraud.

II. The judge instructed the jury that the debt was created by the fraud of the defendant, if the defendant, by his acts or words, prior to or at the time of the sales, intentionally induced the plaintiff to believe that the defendant intended to pay for the goods, and the defendant in fact did not intend to pay, and the defendant induced this belief, intending to deceive the plaintiff, and induce him to sell the goods to the defendant, and the plaintiff was thereby deceived, and was induced by this misrepresentation to make the sales, and would not have made them if the defendant had not made this misrepresentation. Was this a correct statement of the law applicable to this case ?

In *Noble* v. *Adams*, 7 Taunt. 59, the vendee, at the time of the sale, delivered worthless bills in payment, knowing them to be worthless. GIBBS, C. J., instructed the jury that if the vendee went to the vendor, having formed a deliberate plan to put off bad bills for valuable merchandises, knowing the goods would never be paid for, and intending then to abscond with the goods, or to throw them into an immediate bankruptcy, or to pass them over to a particularly favored creditor, the

vendee was guilty of a fraud, and the sale would not change the property; but if the vendee only meant to give these bills, and himself by these bills, more credit than they deserved, but intended to continue to carry on his business, and to try to pay for the goods at some time or other if he could, that was not such a fraud as would vitiate the sale. This instruction, which was held to be correct, made the intent of the vendee never to pay, the material inquiry for the jury in that particular case, and did not present the criminal offence of obtaining goods by false pretences, as the test of fraud in a civil suit. It might have been taken for granted, at the trial, that the case was one of a criminal false pretence, if the vendee intended never to pay. The jury found the sale fraudulent. But it was held that the evidence did not show such a fraud as would vitiate the sale, because there was no proof of what passed between the vendor and the vendee, or by what practices the latter obtained the goods, without which it could not be known whether or not the means which the vendee used were such as to fix him with the offence of obtaining them by false pretences. The whole case, taken together, seems not to support the doctrine that obtaining goods on credit, by concealing an intent not to pay for them, is a fraud in a legal sense.

In *Irving* v. *Motly*, 7 Bing. 543, 552, PARK, J., expressed the opinion that obtaining goods by false pretences is not the only ground upon which a vendor can vacate a sale, and that a contrary rule was not announced in *Noble* v. *Adams.*

In *Bristol* v. *Wilsmore*, 1 B. & C. 514, the bargain was that the price should be paid in ready money; but the vendee prevailed upon the vendor's servant, who made the bargain, to accept a worthless check for the price, by assuring him it was as good as money. It was held, upon authorities tending to show the case within the criminal law of false pretences, that, if the vendee obtained the property with a preconceived design of not paying for it, the fraud would vitiate the sale, and that whether he obtained it with such a design or not was a question of fact which ought to be left to the jury. Such a design was regarded as material; but it would seem that the court did not mean to declare it to be a fraud to obtain property by the mere omission to disclose such a design, without using any worthless bill, or check, or other thing considered as a false token in the criminal law.

In *Hawse* v. *Crowe*, R. & M. 414, the goods were to be paid for on delivery: the vendee gave for them a check drawn by himself on a bank, payable to the vendor; and the check was dishonored. ABBOTT, C. J., held that the transaction was fraudulent if the vendee had not reasonable ground to expect that the check would be paid.

In *Kilby* v. *Wilson*, R. & M. 178, the same judge seems to have held a preconceived design of a vendee not to pay to be fraudulent.

In *Ferguson* v. *Carrington*, 9 B. & C. 59, the goods were bought on credit, were to be paid for by bills accepted by the vendee, such acceptances were given, and the vendee, immediately after receiving the goods, sold them at reduced prices. The vendor contended that it was

manifest that the vendee purchased the goods with the preconceived design of not paying for them. At the trial, Lord TENTERDEN expressed the opinion that if the vendee had obtained the goods with a preconceived design of not paying for them, no property passed to him by the contract of sale. But the case turned on another point, and all the evidence of fraud may not be reported.

In *Load & a.* v. *Green & a.*, 15 M. & W. 216, the jury found that the vendee bought the goods with the fraudulent intention of not paying for them. PARKE, B., delivering the opinion of the court, described the action as trover brought against the assignees of a bankrupt to recover goods obtained by him by a fraudulent purchase from the plaintiffs without intent to pay for them, and which, therefore, the plaintiffs had a right to recover from the bankrupt himself, by avoiding the contract on the ground of fraud, on the principle of the case of *Noble* v. *Adams*, 7 Taunt. 59, and others. But the point decided has no bearing on the question whether obtaining goods, by concealing an intent not to pay for them, is sufficient to vitiate the sale.

In Chitty on Contracts 356, it is said that if one purchases goods with the preconceived design of not paying for them, such sale does not pass the property therein. If this is the English doctrine, there would seem to be reason to expect that it could be more satisfactorily shown in English reported cases than it is in those cited by Chitty. Generally, no doubt, a vendor who alleges fraud in a purchase has some express misrepresentation of a material fact by the purchaser to rely upon, aside from a purchase on credit obtained by the concealment of an intent not to pay. But as the vendor necessarily understands, when the vendee buys on his own credit, that the vendee intends to pay, and the vendee necessarily intends the vendor shall so understand,—as the vendee, by the very act of buying on credit, intentionally induces the vendor to believe he intends to pay, and obtains the goods by inducing the vendor to entertain that belief,—if this, with an intent not to pay, had been regarded as fraudulent in a legal sense, it would seem that this ground alone would have been frequently taken, and that the English reports would show that it had been taken in many cases, and that it had been sustained by explicit decisions, or was so elementary and well understood that no one brought it in question. It can hardly be said that this is shown by the English cases usually cited in this country on this subject.

The English authorities certainly declare, in general terms, that a fraud may be committed by one person inducing another to enter into a contract, by the intentional and dishonest concealment of a material fact which is peculiarly within his own knowledge, or which the other party cannot, by due vigilance, discover ; that a suppression of a truth may be equivalent to an express false representation. But the same authorities seem not to establish the legal bounds of this kind of fraud with precision, by a comprehensive definition or universal rule. It is said to be extremely difficult to advance any general principle upon this subject, inasmuch as what does or does not amount to fraud

depends very much on the facts of every particular case, on the relative situation of the parties, and on their means of information.   Chitty on Contracts 588.   Professor Parsons says the common law not only gives no definition of fraud, but perhaps asserts as a principle that there shall be no definition of it; and he suggests that a definition of it would inform the crafty by what fraudulent devices they could avoid the grasp of the law:   2 Parsons on Contracts (5th ed.) 769.   But the common law claims that it is, or can be, or ought to be, known by all who are subject to its government, and that it is a rational system, and not a collection of rules, maxims, and definitions constructed upon verbal distinctions, to be applied in an arbitrary or literal sense ; and it is not apparent how a definition of fraud, as accurate as legal definitions generally are, taken in the liberal sense indicated by the spirit, and not by the letter, in which all legal definitions are understood, would promote the safe practice of deceit.

The law enforces certain moral duties, and admits that others are of imperfect obligation.   In trade, it prohibits a certain degree of craft, and does not prohibit a certain other degree.   On this subject, as on many others, it may not be easy to fully describe the dividing line, on one side or the other of which all possible cases must fall (a difficulty from which moral philosophy is by no means free).   The whole line may not be judicially promulgated at once, with an exactness and minuteness of detail superior to the fraudulent inventive faculty of all future time.   The general course of the line is well known ; its precise location at all points is presumed to be ascertainable by the application of settled principles, although, at certain points, it may be marked in the authorities only approximately by the cases on either side, whose positions are determined from time to time as they arise.   A proposition concerning an immoral suppression of a material fact being equivalent to an express fraudulent misrepresentation, is everywhere recognized as a statement suggestive of a sound principle ; but the proposition, as commonly expressed, does not determine what is a material fact, or when it is peculiarly within the knowledge of one party, or ought to be discovered by the other party, or under what circumstances the law requires it to be disclosed.   Like *caveat emptor*, and many other maxims and rules, it may be designed to convey some idea of a certain general theory of the law, and not to designate the application of the theory to the varying circumstances of particular cases in actual practice.

In some jurisdictions in this country, the effect of a vendee's concealment of his intent not to pay has been somewhat considered.   " If a man, knowing his own insolvency and utter incapacity to make payment, purchases goods of another, who is ignorant of any change of his circumstances, and sells them under the most implicit belief of the good faith and solvency of the buyer, in what respect does the transaction differ from a direct affirmation by the buyer of his own good faith and solvency ?   If the buyer conceals a fact that is vital to the contract, knowing that the other party acts upon the presumption that no

such fact exists, is it not as much a fraud as if the existence of such fact were expressly. denied, or the reverse of it expressly stated?" STORY, J., in *Conyers* v. *Ennis*, 2 Mason 236, 239, 240.

In *Cross & a.* v. *Peters*, 1 Greenl. 376, 380, the judge instructed the jury that insolvency, unattended by any misrepresentations or falsehood in obtaining credit, would not render the purchase from the plaintiffs void; and that, unless the vendee obtained credit, with a fraudulent intent and secret understanding with one H that the goods should be attached by him to secure his debt, the verdict should be for the defendant; but that, if the goods were purchased with such intention and understanding, the verdict should be for the plaintiffs. The verdict was for the defendants; and the court refused to set it aside,— first, because there was no proof that the vendee knew he was insolvent; secondly, because, if he had known it, he was not bound to disclose it, and no deceptive assurances or false representations were fraudulently made by him. It was said the purchase would be void if made in pursuance of the secret arrangement with H, because there would be an indictable conspiracy.

At the trial of *Wiggin* v. *Day*, 9 Gray 97, the buyer's intent not to pay was regarded as material, as it might sometimes be, even if not sufficient of itself to constitute fraud.

" We can entertain no doubt that when goods are purchased with a preconceived intention not to pay for them, this is a fraud upon the vendor, which will entitle him to repudiate the sale. Such is the doctrine of the English authorities; and, although it has been questioned in some recent cases in Pennsylvania and New York, it rests upon sound principles of morality and law. In such a case, the fraudulent party pretends to be a purchaser when he is not, but is, in fact, attempting to obtain possession of the property of another, dishonestly, with a view to deprive him of it without consideration. As far as the buyer is concerned, the whole sale is a mere fiction, a delusion imposed upon the seller, to induce him to part with the possession. If it be said that a mere intention does not constitute a fraud, the answer is, that the purchase, with such a fraudulent intention, is a fraudulent act. In its moral quality, it is hard to distinguish it from a larceny. There are other cases in which an intention to defraud entitles the party against whom the fraud is meditated to treat a sale as a nullity, such as sales made with intent to defraud creditors. And, however the law might be held elsewhere, in Massachusetts a purchase of goods, with an intent not to pay for them, is expressly recognized by statute as a fraud which will deprive the debtor of the benefit of the act for the relief of poor debtors, and may subject him to sentence of imprisonment. Gen. Stats., ch. 124, secs. 5, 34. Rev. Stats., ch. 98, secs. 31, 36." .,*Dow* v. *Sanborn*, 3 Allen 181, 182.

" We believe that the rule is now settled, that if a person purchases goods with a preconceived design not to pay for them, the vendor has a right to treat the sale as void." *Thompson* v. *Rose*, 16 Conn. 71, 81.

In *Powell* v. *Bradlee*, 9 Gill & J. 220, 248, 278, it was held that a

purchase is fraudulent, if the vendee at the time of the purchase is insolvent, knows he is insolvent, has no reasonable expectation of paying for the goods purchased, and conceals these facts from the vendor, who by ordinary prudence cannot know of their existence.

Obtaining property with a preconceived design never to pay for it, under color of a formal sale, induced by a sham promise to pay, which the party intends never to comply with, is a fraud. *Bidault* v. *Wales*, 19 Mo. 36 ; S. C. 20 Mo. 546.

In a *dictum* in *Bell* v. *Ellis*, 33 Cal. 620, 630, the rule, that the concealment of an intent not to pay is fraudulent, is doubted.

When dealings between a vendor and vendee, during a period of years, naturally would excite and have excited the confidence of the vendor in the responsibility and integrity of the vendee, and the vendee commits an open and notorious act of insolvency by assigning all his property, and two days afterwards buys goods of the vendor without informing him of the assignment, the purchase is fraudulent. *Mitchell* v. *Worden*, 20 Barb. 253. The doctrine, that concealment of intent not to pay is fraudulent, was adopted in *Buckley* v. *Artcher*, 21 Barb. 585. " If a purchaser who is insolvent conceals that fact from the vendor, and thus obtains goods without intending to pay for them, it is a fraud." *Durell* v. *Haley*, 1 Paige 492, 493. " A purchase, with intent not to pay, is such a fraud as will avoid the sale." *Ash* v. *Putnam*, 1 Hill 302, 305. In *Nichols & a.* v. *Pinner & a.*, 18 N. Y. 295, 297, 302, 303, 305–311, 315, the judge instructed the jury that if the vendee procured the possession of the goods from the vendors fraudulently, with a preconceived design not to pay for them, they would have the right to repudiate the sale. A new trial was granted because the judge refused to charge, as requested, that the mere omission of the vendee to disclose his insolvency was not fraudulent; and the question, whether a preconceived design not to pay renders a purchase fraudulent, was not decided, although three of the judges expressed opinions upon it,—HARRIS and ROOSEVELT, JJ., holding the affirmative, and SELDEN, J., the negative. Judge HARRIS, upon an examination of authorities, concludes that, in asserting that there must have been actual artifice, intended and fitted to deceive, before a vendor can reclaim his property on the ground that he has been defrauded, *Smith* v. *Smith & a.*, 21 Pa. St. 367, stands alone, and is unsupported by principle. Judge SELDEN said,—" The law takes no cognizance of a naked design which is demonstrated by no act. If one *does* only that which is lawful, and violates *in action* no positive duty, his intentions cannot be reached. An intent to overthrow the government is not treason without an overt act. An intent to commit murder or any lesser crime is never punishable, and an intent to commit a fraud is governed by the same rule. The intention may exist at one moment, and be changed the next. The party is *in loco penitentiæ* until he does some act in furtherance of the intent. The purchase of goods is a lawful act, and the validity of the purchase cannot be affected by the mere mental state of the purchaser." In *Hall* v.

*Naylor*, 18 N. Y. 588, 589 (S. C. 6 Duer 71), COMSTOCK, J., delivering the opinion of the court, said,—"It does not appear that Kerr & Co., on purchasing the goods in question, made any representations of their ability to pay for them. If, however, they concealed the fact of their insolvency, with a design of procuring the goods and not paying for them, it was a fraud which rendered the sale void, if the plaintiff (the vendor) chose so to regard it. On the trial of such an issue, the *quo animo* of the transaction is the fact to be arrived at."

In *Smith* v. *Smith & a.*, 21 Pa. St. 367, it was held, by a majority of the court, that a vendee's concealment of his insolvency and of his intent not to pay, without any fraudulent overt act or actual artifice, intended and fitted to deceive the vendor, is not fraudulent. LOWRIE, J., delivering the opinion of the majority, said,—"An intention not to pay is dishonest, but it is not fraudulent. * * * And it is no more fraudulent to have such an intention at the time of the purchase, than at the time when payment ought to be made. * * * It is no more fraudulent in an insolvent than in a perfectly solvent man, to have such an intention. * * * Insolvency is a state of one's affairs; and the consciousness of it, and the intention not to pay, are states of the mind, and if these constitute fraud, then it may be made out without proof of a single overt fraudulent act. And if none of its elements consist of an overt act, then the law requires no evidence of an overt act to establish it. * * * Where must we look for the fraud? Not in the buyer's intention merely. It must be a fraud upon the vendor, that is, a fraud acted out. We are seeking to avoid a contract because it was induced by fraud, that is, because there was some fraudulent act leading to it. The very statement of the proposition excludes the act of purchase from being an element in the fraudulent conduct, and makes it a consequence of it. What, then, is left but the dishonest intention and the concealed insolvency? And, surely, these did not induce the vendor to sell his goods. The error, in the other view, is in making the purchase a part of the fraud, instead of the object and consequence of it. All the books concur in placing the avoidance of the contract on the ground of actual fraud practised in procuring it. And, as between persons standing upon an equal footing, and holding as to each other no relation of influence or trust, all authorities, when they speak clearly on the subject, regard it as essential to actual fraud that the intent to mislead should be acted out by false representations, contrivances, or artifices, or by conduct which reasonably involves a false representation. The rule is proved by the exceptional cases, where special confidence is reposed and influence presumed. Here the law interferes, though there be no actual fraud. * * * There must have been actual artifice, intended and fitted to deceive, before a man can claim that he has been defrauded."

It is necessary to consider the reasons given by Judge SELDEN, in *Nichols* v. *Pinner*, and by Judge LOWRIE, delivering the opinion of the majority of the court in *Smith* v. *Smith & a.*, for holding that a person who induces another to let him have goods on credit, by concealing

an intent not to pay for them, is not guilty of a fraud in a legal sense. The reasons given by Judge SELDEN are, that, as an intent to overthrow the government is not treason, and an intent to commit ‘any other crime is not a crime, so a mere intent to commit a fraud is not the commission of a fraud; that the vendee, intending at the time of the purchase never to pay, may change his mind, and pay the price when it becomes due, and is *in loco penitentiæ* until he does some act in furtherance of the intent ; that the purchase of goods is a lawful act, and the validity of the purchase cannot be affected by the mere mental state of the purchaser. Are these reasons sufficient ? If one does only that which is lawful, the law does not generally take notice of his intention ; but an act, lawful when done in good faith, with an honest purpose, may be unlawful when done in bad faith, with a dishonest purpose. The law, in many cases, takes particular notice of the knowledge, intent, and state of mind with which an act is done. The purchase of goods is, in general, a lawful act; but the purchaser's knowledge that the goods were stolen by the person of whom he buys them, may be a very material fact. 1 Hale P. C. 620. Upon a question of unlawfulness, and even of criminality, the intent of the owner. of goods to part with the ownership, or only with ·the possession of them, is often decisive. *Mowrey* v. *Walsh*, 8 Cow. 238 ; *State* v. *Watson*, 41 N. H. 533. The purchaser's knowledge of the seller's intent to delay, hinder, or defraud his creditors may vitiate the sale, and deprive the purchaser of property for which he has paid the full value. *Robinson* v. *Holt*, 39 N. H. 557.. The validity of a purchase may be affected by the mere mental state of the purchaser.

The substance of a contract is a mutual understanding, existing in fact or in contemplation of law. A contract of sale, from B to A, completely performed, is their mutual understanding, executed by the delivery of the goods and the payment of the price. The understanding is, that A is to acquire the possession and ownership of B's goods, and to pay for them. Without a mutual understanding that A is to pay for them, there is no sale. If both parties understand there is to be no payment, the transaction is a gift, and not a sale. If B understands there is to be payment, and A understands there is to be no payment, it is neither a sale nor a gift, and the title does not pass, because there is no mutual understanding, unless a case of estoppel can be made out by one party against the other. When A so conducts as to intentionally cause B to understand that A is a purchaser, or, in other words, that the transaction is a sale, he necessarily causes B to understand he intends to pay, because a sale or purchase necessarily implies payment or an intent to pay. If he acts in bad faith, intending never to pay, and therefore the understanding is in fact not mutual, still B could maintain an action on the contract, because A would be estopped to deny that his understanding and intent were what he induced B to understand they were. Having, by his words or conduct, wilfully caused B to believe the existence of a certain state of facts, and induced him to act on that belief so as to alter his previous posi-

tion by parting with his goods, A is concluded from averring against him a different state of things as existing at the same time.  *Davis* v. *Handy*, 37 N. H. 65, 75.  This estoppel B may set up against A.  But he is not obliged to set it up.  He may take the ground that, there being in fact no mutual understanding, no meeting or agreement of minds, no harmony of intention, no joint assent to the same thing, there was no contract.  And when he takes that ground, it may be said that the validity of the sale is affected by the mere mental state of the parties, or it may be said that there was no sale to be affected by the mental state of the parties.  In this analysis, the entire contract falls to pieces and disappears, and the transaction, resolved into its original and real elements, becomes a wrongful and fraudulent conversion of B's goods by A.  And when B may allege that the contract or the debt was created by the fraud of A, he may sustain his allegation by proof of facts which would show that by reason of A's fraud there would have been no contract and no debt, if B had chosen to take that ground.

The intent to commit a fraud is not the commission of a fraud ; but when A, in the assumed character of a buyer, *animo furandi*, obtains goods of B on credit by the concealment of such a material fact as an intent not to pay—a fact peculiarly within his own knowledge, and impossible to be discovered by B—the fraudulent part of the transaction cannot be reduced to the fact concealed, the intent not to pay.  The concealment of that fact is fraudulent.  B has lost his goods : that is a serious part of the business.  They have been taken from him with an agreement on his part to give time for payment : he cannot, in an action on the contract, recover their value till that time has passed : that time was obtained from him by A for the purpose of gaining a position of safety and defiance by so disposing of the goods (and his own property, if he had any exposed to attachment) that B could never recover his goods or their value.  This is another practical matter, of no little importance.  The fraudulent part of all this cannot be called a mere intention or state of the mind.  The condition of both parties is substantially changed by means of the fraudulent concealment.  B has lost his goods, and A has obtained them without any valuable consideration.  Not only has B lost them, but, if he is held to his agreement to give credit, he has lost them irrevocably ; for it must be presumed that A will avail himself of his advantage, and use the time of so-called credit for the purpose for which he obtained it.  No one in B's situation would regard A's fraudulent design as wholly unexecuted ; and if the law says it is wholly unexecuted, there is something singular in legal language or in legal ideas.  If the law holds B during the period of credit utterly helpless, it not only allows A to rob B, but gives A time to make off with his booty after the robbery is discovered.  An intent to obtain goods by a pretended purchase and not to pay for them, is a mere operation of the mind, that for inoffensiveness may be classed with an intent to overthrow the government.  But actually obtaining goods, under the false pretence

of a purchase, with intent not to pay for them, taking them from their owner by an intentional concealment of the real character of the transaction, *animo furandi*, is as far from being a mere naked, unexecuted design, as levying war is from being a mere emotion.

An intent to commit a fraud is not a fraud committed;—but the question is, whether obtaining goods and credit under color of a pretended purchase by concealing an intent not to pay for them is a fraud committed, or whether in such an affair there is nothing fraudulent but an unexecuted intent to commit a fraud. If the intent not to pay were the only fraudulent intent, it might be claimed that the only intended fraud would not be committed till the time of payment arrived. But the fraudulent design of which B complains is the intent of A to get goods without payment, and by fraudulent concealment. That intent is executed the moment A gets the goods. No overt act remains to be done by him to complete the artifice practised upon B. The expiration of the time of credit is not an overt act of A, or an execution of the entire fraudulent intent. By what A does during the time of credit, he does not obtain the goods or the credit, nor induce B to enter into a contract of sale, but merely fortifies himself against B's legal remedies. The intent not to pay is a material fact, by the concealment of which he induces B to part with his goods on credit. And it is only by confining the dishonest design to the intent not to pay at a future time, that the fraudulent intent can be said to be unexecuted when the goods are obtained. But the fraudulent design is not merely negative,—not to pay at a future time; it is also affirmative,—to obtain the goods and the credit by the concealment of the material fact of the intention not to pay. This concealment is not a mere fraudulent intent: it is the execution of a fraudulent intent and the commission of a fraud, if a fraud can be committed by the concealment of a material fact. At common law, a fraud may be committed by the omission to disclose a material fact under some circumstances. *Hanson* v. *Edgerly*, 29 N. H. 343 ; 2 Kent's Com. 482–492, 513, 514. If the owner of goods desires to get rid of them without payment, he gives them away, or throws them away, or destroys them. Payment is his object in selling them. And, payment being the whole of the contract which he desires the vendee to perform, what fact can be more material than the vendee's intent not to pay, comprehending not only an intent not to try to pay, but also an intent to try not to pay ? Whether the vendee's intent not to pay is a material fact, and whether it is so peculiarly within the vendee's knowledge *(Hoitt* v. *Holcomb*, 32 N. H. 202–206 ; *Page* v. *Parker*, 40 N. H. 71), and so peculiarly beyond the vendor's knowledge and means of information that the vendee's omission to disclose it is a concealment of it, may be questions of fact which the vendee might ask a jury to pass upon. But they are questions of such a nature that he must be presumed to waive them unless he distinctly raises them. What circumstance, then, is wanting to bring the case within the principle that a fraud may be committed by an omission to disclose a material fact ?

During the time of credit, is the vendee *in loco penitentiæ?*   When one fraudulently obtains goods on credit by a false representation, he is not *in loco penitentiæ.*   The vendor may get his pay if he will wait; but he is under no obligation to wait, because, the contract of sale and credit being fraudulent on the part of the vendee, the other party is not bound by it.   By what legal distinction is the vendee *in loco penitentiæ* when his fraud is concealment, and not *in loco penitentiæ* when his fraud is misrepresentation?   If the vendor is not bound by his agreement in the latter case, how is he bound in the former?   If, at the time A converts B's goods to his own use, he discloses to B his intent never to pay for them; if a future time of payment is agreed upon, both parties understanding that payment is never to be made; if B relies upon A's changing his mind, paying for goods which by the agreement he is not to pay for, and turning a gift into a sale,—A will have the agreed opportunity for changing his mind.   But when he has obtained the goods by fraudulently inducing B to believe he intends to pay for them, and fraudulently concealing his intent not to pay, and then claims a time in which to elect whether he will repent or not, he can maintain his claim only on the ground that, by a contract binding on the other party, he was to have such a time.   The contract, induced by his fraudulent concealment, is in no part binding on the other party.   Moreover, by what stipulation was the peculiar privilege *loci penitentiæ* secured?   When B alleges the validity of the contract, and claims payment before it is due, A may defend on the ground that the action is premature.   But when B alleges that the debt was created by fraud, and A claims, not that the action is premature and the debt not due, but that he is *in loco penitentiæ*, he claims that which would be a consequence of the contract being valid.   The contract is what the parties mutually understood : B understood that he gave A time. Time for what?   For payment, or for avoiding payment, or for repenting of a resolution not to pay?   That is a question of fact which A would not ask a jury to settle.   B did not undertake to give A time to live, or time to do nothing, or time to do anything in general.   He agreed to give A time, in a certain sense, and for a particular purpose ; and that purpose was an opportunity to carry out the intent to pay, which had no existence.   B understood the time was for payment ; A understood it was for avoiding payment; neither of them understood it was for repenting.   A caused B to understand that the time was for payment, and to act upon such an understanding in the belief that it was mutual, and A is estopped to deny that it was mutual.   And the law cannot apply the penitential theory to such a case without altering a fraudulent contract, making it, in an essential and vital part, what neither of the parties understood it to be, and enforcing it upon the defrauded party.   Even if the law were to make the contract for the parties, it would make a reasonable one, consistent with the sense of business men, the interests of trade, and the welfare of society. And it would not be reasonable to require B to wait for a possible favorable result of a possible working of A's conscience, which he did

not agree to wait for. In a practical, mercantile view, the chance of A's improving the opportunity, as he intended, would be entitled to as much consideration as the prospect of his unintended reformation.

The reasons given by Judge Lowrie, in the opinion of the majority of the court in *Smith* v. *Smith & a.*, are, in substance, the same as those given in the opinion of Judge Selden, in *Nichols* v. *Pinner*. They are all based on the proposition that a mere fraudulent intent is not a fraud—a proposition that does not cover the case of obtaining goods and credit by the fraudulent concealment of a material fact. In the former opinion it is said, that it is no more fraudulent to have an intent not to pay, at the time of the purchase, than at the time when payment ought to be made; that such an intent is no more fraudulent in an insolvent, than in a perfectly solvent man; that the act of purchase cannot be a part of the preceding fraud necessary to invalidate the purchase; and that the intent to defraud must be acted out by false representations, contrivances, or artifices, or by conduct which reasonably involves a false representation. The mere intent not to pay, separated from everything else, and considered by itself, without reference to any accompanying motive, word, or act of omission or commission, may be no more fraudulent, in a legal or moral sense, at one time than another. But, while such an intent, coming into existence in A after a real purchase, does not induce B to make the contract of sale, the deceitful concealment of the fact of such an intent existing at the time of a pretended purchase, by which A induces B to part with his goods on credit, possesses every essential, moral, and legal element of fraud. The solvency or insolvency of A may be evidence on the question of his intent; but his fraudulent intent and his fraudulent concealment of it are equally fraudulent, whether he is solvent or insolvent. No other preceding overt act than a fraudulent concealment of a material fact is necessary to constitute fraud. When the intent not to pay is concealed, the intent to defraud is acted out. The mere omission of A to disclose his insolvency might not be satisfactory proof of a fraudulent intent in all cases. He might expect to become solvent. He might intend to pay all his creditors. He might intend to pay B, though unable to pay others. His fixed purpose never to pay B is a very different thing from his present inability to pay all or any of his creditors. A man may buy goods, with time for trying to pay for them, on the strength of his known or inferred disposition to pay his debts, his habits, character, business capacity, and financial prospects, without his present solvency being thought of, and even when his present insolvency is known to the vendor. But who could obtain goods on credit, with an unconcealed determination that they should never be paid for? The concealment of such a determination is conduct which reasonably involves a false representation of an existing fact, is not less material than a misrepresentation of ability to pay *(Bradley* v. *Obear*, 10 N. H. 477), and is an actual artifice, intended and fitted to deceive.

An application for or acceptance of credit, by a purchaser, is a

representation of the existence of an intent to pay at a future time, and a representation of the non-existence of an intent not to pay. What principle of law requires a false and fraudulent representation to be express, or forbids it to be fairly inferred from the act of purchase? A representation of a material fact, implied from the act of purchase, and inducing the owner of goods to sell them, is as effective for the vendee's purpose as if it had been previously and expressly made. If it is false, and known to the pretended purchaser to be false, and is intended and used by him as the means of converting another's goods to his own use without compensation, under the false pretence of a purchase, why does it not render such a purchase fraudulent? When the intent is to pay, it is necessarily understood by both parties, and need not be expressly represented as existing. When the intent is not to pay, it is of course concealed. Whether the deceit is called a false and fraudulent representation of the existence of an intent to pay, or a fraudulent concealment of the existence of an intent not to pay, the fraud described is, in fact, one and the same fraud. A man obtains goods on credit by fraudulently representing (that is, fraudulently causing their owner to understand) that he intends to pay for them; or, he obtains them by fraudulently concealing his intent not to pay for them;—if he obtains them in either way, he obtains them in both ways. In the instructions given to the jury in the present case, the question was presented as one of fraudulent representation. It seems to be immaterial, in such a case as this, whether the question is left to the jury as one of fraudulent representation, or of fraudulent concealment; and the instructions, in any view to which our attention has been called, do not appear to us to be erroneous.

*Judgment on the verdict.*